**NOT FOR PUBLICATION**

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                            :
MICHAEL P. WILLIAMS,          :
                                            :
         Plaintiff,                 :
                                            :         Civil Action No. 08-4830 (JAG)
                v.                   :
                                            :                **OPINION**
FORD MOTOR COMPANY,       :
                                            :
         Defendant.              :
_____:

**GREENAWAY, JR., U.S.C.J.**[1]

      This matter comes before this Court on a motion to "Dismiss and to Affirm ERISA Administrative Decision", by Defendant Ford Motor Company ("Ford"), against Plaintiff Michael Williams ("Williams" or "Plaintiff"). For the following reasons, Ford's motion to dismiss is granted.

### I.   INTRODUCTION

      Plaintiff Michael Williams brings the instant action against Ford Motor Company, alleging that Ford's denial of Williams' disability retirement benefits was erroneous. The following facts are derived from the administrative record (hereinafter cited to as "AR_____").

      From September 1, 1993 until April 6, 1998, Williams was employed by Ford as an electrical engineer. AR0002. On April 6, 1998, Plaintiff suffered an on-the-job head and

---

[1]Sitting by designation on the District Court.

shoulder injury, when an air hose dislodged from a piece of machinery and hit Plaintiff. AR0034.  After the air hose struck Plaintiff, he lost consciousness, fell, and hit his head against the concrete floor, further injuring himself.  Id.  Plaintiff was taken to the hospital, where he was diagnosed with a shoulder contusion and a diffuse brain injury.  AR0212.  Following his hospital stay, Williams received physical and occupational therapy in both inpatient and outpatient facilities.  AR0261.

On April 21, 1998, Plaintiff's treating physician notified Ford's medical department that Plaintiff was disabled and unable to return to work until April 6, 1999.  AR0240.  On July 14, 1999, Plaintiff underwent a neuropsychological evaluation, performed by Dr. Julie Lynch. AR0068-74.  Dr. Lynch found "evidence of improvement in [Plaintiff's] visual attention and processing speed, conceptual reasoning, and verbal fluency."  AR0073.  Nonetheless, Dr. Lynch found that "William's [sic] deficits prohibit his return to a competitive or gainful work setting ... primarily due to his significantly reduced cognitive endurance."  AR0073.  Following the evaluation, Williams remained on medical leave from work, and continued to receive disability and worker's compensation benefits.  AR0192.[2]

On June 12, 2002, Plaintiff submitted to a psychological examination performed by Dr. Richard Bing, PhD, as part of disability determination proceedings for the North Carolina Department of Health and Human Services.  AR0032-38.  After examining Plaintiff, Dr. Bing concluded that Plaintiff's "inability to sustain adequate concentration and working memory for

---

[2]On October 10, 1998, Williams' employee status changed officially from a "Medical Leave of Absence" to a "Release–Unable to Return to Work After Expiration of Medical Leave." AR0004.  The change in status, however, did not affect Williams' receipt of disability or worker's compensation benefits.  Id.

no longer than approximately a half an hour of testing, clearly indicates that he would have difficulty performing adequately in a competitive and gainfully employed work position across the course of an eight-hour workday." AR0037-38.

On May 28, 2003, at the behest of Ford, an investigator began video surveillance on Plaintiff. AR0039. The investigator concluded that Plaintiff was "very active". Id. Specifically, on May 28, 2003, Plaintiff was observed "standing on a ladder, while hammering nails into a plywood roof about 6-foot in dimension"; and "lying prone, while reaching, and hanging off the edge of the roof." AR0059. On May 30, 2003, Plaintiff was again observed "kneeling while hammering on the roof under construction behind his residence. [Plaintiff] installed wood on the roof, using both hands and arms while kneeling." AR0063-64.

On June 21, 2003, Plaintiff submitted to Ford an application for disability retirement benefits based upon his diffuse brain injury and claim of total and permanent disability. AR0006-18.

According to the Ford disability retirement benefits plan (the "Plan"), the Ford Retirement Committee ("the Committee") shall find an active member eligible for disability retirement if the individual "(i) has completed 10 or more years of credited service, (ii) has become totally and permanently disabled after the effective date of the Plan, and (iii) has not reached his or her Normal Retirement Date." AR0289.

"Total and permanent disability" is defined by the Plan as follows:

> A member shall be deemed to be totally and permanently disabled only if the Committee determines the member is not engaged in regular employment or occupation for remuneration or profit ... and if the Committee shall find, on the basis of medical evidence, (i) that he or she is totally disabled by bodily injury or disease so as to be prevented from employment with the Company, (ii) that such

>disability has been continuous for at least 5 months, and (iii) that such disability
>will be permanent and continuous during the remainder of his or her life.

AR0290.

In response to Plaintiff's application, Dr. Andrew Nelson issued a letter summarizing his findings based on a review of Plaintiff's medical records and the May 2003 surveillance report. AR0027.  Dr. Nelson concluded that while Williams "suffered a permanent cognitive disability ... [there was] no evidence to suggest total disability."  AR0027.  Referencing the surveillance findings, Dr. Nelson noted that "Williams is capable of doing simple and some complex tasks ... [w]ithout apparent difficulty."  Id.  Dr. Nelson went on to suggest that it was in Ford's "best interest to get an additional independent medical examination, which would include neuropsychological testing, and possibly, a functional capacity."  Id.

Dr. William Heckman, Ford's executive physician, also reviewed Plaintiff's medical records and the surveillance report, in contemplation of Plaintiff's eligibility for benefits. AR0019.  Dr. Heckman concluded that Plaintiff was "not totally and permanently disabled and currently or in the future ... expected to be capable of performing regular work."  Id.  Dr. Heckman circulated his findings to the Committee, which subsequently denied Plaintiff's claim for benefits.  AR0141.  Plaintiff was notified of the Committee's decision via letter on August 2, 2004.  AR0138.

On August 9, 2004, Plaintiff appealed the denial of benefits.  AR0029-31.   Plaintiff requested that the Committee review the reports of Doctors Bing and Lynch.  AR0031.  Both Doctors concluded that Plaintiff's injuries would "prohibit" or make difficult, a return to gainful

employment.  Id.  Plaintiff also noted that he was currently under the care of Dr. Gilbert Snider.[3]

Once again, Dr. Heckman opined that Williams was not totally disabled, but that it did not "appear that he could return to his former job."  AR0026.  As a result, Ford contacted Plaintiff requesting additional information, including: "1) Has he received [Social Security Disability benefits], and 2) Provide an updated letter from his treating physician regarding his cognitive ability and whether he was totally and permanently disabled or whether his disability limits his ability to perform certain tasks such as those requiring problem solving, analytical skills, extended period [sic] of concentration, etc.  Letter should be provided to Ford Medical."  AR0136.

Williams responded to Ford's request by forwarding a Social Security benefit statement and a March 29, 2005 letter from Williams' treating physician, Dr. Gilbert Snider.  AR0021-25.  Dr. Snider stated that there was "no indication that there has been any change in [Williams'] clinical or cognitive status since ... [Williams'] neuropsychological testing on April 6, 1998."  Id.[4]

In the face of apparently conflicting evidence–the surveillance evidence and Dr. Snider's letter– Dr. Heckman stated that he was unable to determine the totality of Plaintiff's disability without further testing.  AR0096.  As a result, Dr. Heckman again failed to find that Plaintiff was totally and permanently disabled, and recommended a denial of benefits.  AR0095.

---

[3] In September 2001, Dr. Gilbert Snider began treating Plaintiff for "post-traumatic encephalopathy."  AR0024.

[4] In the record before this Court, there is no supporting documentation, such as test results, appended to Dr. Snider's March 29, 2005 letter.  There is also no supporting documentation appended to the Social Security benefit statement describing how Plaintiff's benefit determination was made.

5

On August 19, 2005, Plaintiff met with Karla Thompson[5], PhD, to undergo additional evaluation, as requested by his worker's compensation carrier. AR0078. Dr. Thompson reviewed Plaintiff's comprehensive medical file and conducted her own series of tests[6]. AR 0078, 86. Dr. Thompson concluded that Williams "sustained a 'real' and significant brain injury." AR0089. Nonetheless, "with Mr. Williams more than 7 years post injury," Dr. Thompson could not "believe that Mr. Williams has significant residual cognitive impairment as a result of his 1998 brain injury." AR0090.

On the basis of her evaluation, Dr. Thompson concluded that there was no "objective evidence that this relatively young and otherwise healthy [Plaintiff] is completely and permanently disabled. AR0077. Upon review of Dr. Thompson's findings that Plaintiff was not totally and permanently disabled, Dr. Heckman once again recommended denial of benefits. AR0132.

On July 1, 2007, Plaintiff sent Ford another letter from Dr. Snider. AR0092. The July 1

---

[5]In Ford's moving brief, Dr. Thompson is referred to, at different times, as both "Kayla" and "Karla" Thompson. A review of the record reveals that Dr. Thompson's first time is, in fact, Karla. AR0077.

[6]Dr. Thompson administered the following tests:

> Animal Naming
> Controlled Oral Word Association Test (COWA)
> Minnesota Multiphasic Personality Inventory – 2 (MMPI-2)
> Test of Memory Malingering (TOMM)
> Wechsler Adult Intelligence Scale, 3rd Edition (WAIS-III), Symbol Search
> Wechsler Memory Scale, 3rd Edition (WMS-III), selected subtests
> Word Memory Test

AR0086.

letter, like Dr. Snider's March 29 letter, stated that Plaintiff had been in his care since September 17, 2001, with no change in clinical status. AR0093. Dr. Snider opined that the workplace injury had rendered Plaintiff totally and permanently disabled. Id. Like the March 29 letter, the July 1 letter did not include reference to any specific tests conducted by Dr. Snider.

Dr. Heckman reviewed Dr. Snider's letter, but concluded that there was "inadequate objective evidence to consider [Plaintiff] as totally and permanently disabled," in the face of the results of Dr. Thompson's recent independent evaluation. AR0108. Thereafter, the Committee requested that Plaintiff provide "any updated medical information concerning [his] disability." AR0103.

On November 13, 2007, Plaintiff mailed letters to the Committee and Dr. Heckman that included the summary of a September 11, 2006 neuropsychiatric evaluation performed by Dr. Lawrence M. Eisenstein. AR0100-2. Dr. Eisenstein recounted his earlier treatment of Plaintiff. AR0100. Dr. Eisenstein also restated Plaintiff's symptoms, complaints, and treatments, including that Plaintiff "continues to see a neurologist and takes Zoloft and Ritalin. He only drives locally ... He has not been able to work and remains on social security disability." AR0101. Dr. Eisenstein concluded that Plaintiff's "neurologic disability renders him 100 percent totally and permanently disabled." Id.

Notwithstanding Dr. Eisenstein's conclusion, Dr. Heckman remained unswayed in his opinion that Plaintiff was not totally and permanently disabled. Dr. Heckman reported to the Committee that Dr. Eisenstein's 2007 evaluation provided "no new objective documentation" to refute Dr. Thompson's 2005 findings. AR0109. Specifically, Dr. Heckman stated that Dr. Eisenstein failed to provide any "objective testing to document the level of cognitive deficit." Id.

On December 14, 2007, on the basis of Dr. Heckman's recommendation, the Committee again denied Plaintiff's appeal. AR0110. The Committee again instructed Plaintiff to forward any updates on his medical condition to Dr. Heckman for reevaluation. Id.

Plaintiff sent no further updates to Ford, in response to the December 14, 2007 denial of benefits. Instead, Plaintiff filed suit in this Court, on September 24, 2008, seeking review of the Committee's decision to deny him disability retirement benefits. (See Docket Entry No. 1.) In the Complaint, Plaintiff alleges causes of action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et als. ("ERISA"). Compl. ¶¶ 25-33. On June 22, 2009, Defendant moved to "Dismiss and to Affirm ERISA Administrative Decision." (Docket Entry No. 11.)

This Court has jurisdiction over this ERISA action, pursuant to ERISA's civil enforcement provisions, 29 U.S.C. §1132(a)(l) and (3), and § 1132(c), and under the District Court's jurisdiction over federal questions, pursuant to 28 U.S.C. §1331.

## II.   STANDARD OF REVIEW

A denial of benefits under ERISA is generally reviewed "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Doroshow v. Hartford Life & Acc. Ins. Co., 574 F.3d 230, 233 (3d Cir. 2009) (citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). "When the administrator has discretionary authority to determine eligibility for benefits ... the decision must be reviewed under an arbitrary and capricious standard." Id. "Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is without reason,

unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993).

Under that standard, however, "if a benefit plan gives discretion to an administrator or a fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." Id. (internal citations omitted). The existence of a conflict does not warrant a more searching review. Id. at 234 (citing Metropolitan Life Ins. Co. v. Glenn, --- U.S. ----, 128 S. Ct. 2343, 2351 (2008)). Rather, a reviewing court should consider the conflict of interest–but only as one consideration among many. Id.[7]

In the instant action, the parties do not dispute that the Plan expressly grants such discretionary authority to Ford; therefore, this Court shall apply the arbitrary and capricious standard, in reviewing Ford's denial of Plaintiff's claim.

### III.  ANALYSIS

Ford's decision to deny disability retirement benefits to Williams was neither arbitrary nor capricious. Plaintiff argues that "Defendant's position, that six (6) years after receiving both

---

[7]Plaintiff highlights the law of conflict of interest as it relates to ERISA plan decisions, possibly in an attempt to argue that Ford, as simultaneous administrator and payor, is conflicted. Plaintiff's Brief in Opposition to the Motion to Dismiss, at 10-11. In the ERISA context, the argument of conflict generally advanced is that "some degree of conflict inevitably exists where an employer acts as the administrator of its own employee benefits plan." Abnathya, 2 F.3d at 45 n.5.

Plaintiff, however, presents no facts related to this argument. There are also no facts in the administrative record to support the inference that Ford, as employer and administrator of the Plan, acted in bad faith to deny Plaintiff benefits. Moreover, in light of the medical evidence supporting Ford's decision to deny benefits, discussed *infra*, this Court finds that any conflict of interest does not tip the scale in favor of a finding that Ford acted in an arbitrary or capricious manner.

Social Security benefits and Worker's Compensation benefits, that the Plaintiff is (at this time) now capable of some type of work, is simply an opinion without basis." See Plaintiff's Brief in Opposition to the Motion to Dismiss, at 10. To the contrary, the Committee's decision to deny Plaintiff benefits was supported by the 2005 test results and video surveillance showing Plaintiff's ability to engage in significant physical labor on two separate occasions.

With every denial of benefits, the Committee also notified Plaintiff of his right to submit additional updated information. Plaintiff repeatedly sent the Committee additional documentation that the Committee felt, at the time, failed to concretely and objectively contradict Dr. Thompson's evaluation. In fact, there is presumably nothing preventing Plaintiff from sending updated medical information to Ford for reconsideration even today.

The trouble lies in the substance of Plaintiff's submissions. Ford reasons that the submissions of Doctors Snider and Eisenstein contain no objective reasoning, such as test results, in support of their opinions that Plaintiff is totally and permanently disabled. Ford also asserts the Social Security benefits stub, without an explanation of the appropriateness of those benefits, is insufficient evidence of the totality and permanency of Williams' disability. This Court finds neither of these assertions to be arbitrary or capricious.

In making its decision, Ford relied on Dr. Thompson's voluminous neuropsychological testing report, which lies in contradiction to the submissions of Doctors Snider and Eisenstein. In the record before this Court, Dr. Thompson was the most recent individual to conduct such testing on Plaintiff. Ford also relied on video surveillance, which clearly showed Plaintiff engaged in physical labor around his home. The record is clear that Ford considered each submission by Plaintiff's treating physician Dr. Snider, and the report of Dr. Eisenstein. When

faced with apparently conflicting evidence, the Committee also repeatedly requested Plaintiff to supplement the record with updated medical reports.  The Committee weighed the evidence before it and came to the reasonable conclusion that Plaintiff was not totally and permanently disabled.

In light of the evidence before this Court, a mere disagreement amongst medical professionals over the totality and permanency of Plaintiff's disability does not render Ford's decision to deny benefits arbitrary or capricious.

### IV.   CONCLUSION

When this Court weighs all the factors before it; the reports and recommendations of all treating and reviewing doctors, the video surveillance report, and any possible conflict of interest, this Court finds that Ford did not act arbitrarily and capriciously in denying Plaintiff disability retirement benefits.  For the reasons stated above, Ford's motion to ""Dismiss and to Affirm ERISA Administrative Decision" is GRANTED.

Date: March 23, 2010

    S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.C.J.
(Sitting by designation on the District Court)